IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JEFFERY ALLEN McCLELLAN, #277145,  )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        CASE NO. 2:11-CV-1007-TMH
                                   )             [WO]
                                   )
DR. HUGH HOOD, et al.,             )
                                   )
            Defendants.            )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Jeffery Allen
McClellan ["McClellan"], an indigent state inmate, challenging the adequacy of medical
treatment provided to him for numbness in his right arm during his incarceration at the Bullock
Correctional Facility ["Bullock"].   McClellan names Dr. Hugh Hood, Nurse Webb,
Administrator Danny Gould and Dr. Tahir Siddiq as defendants in this cause of action.[1]
McClellan seeks monetary damages and injunctive relief for the alleged violations of his
constitutional rights.

The defendants filed special reports, a supplemental special report and relevant
supporting evidentiary materials, including affidavits and medical records, addressing

---

[1]The defendants are all employees of Corizon, Inc. ["Corizon"], the contract medical care provider for the
Alabama Department of Corrections.  Dr. Hood serves as the Associate Regional Medical Director for Corizon  Ms.
Webb is a certified registered nurse practitioner assigned to Bullock, Dr. Siddiq serves as the attending physician at
Bullock, and Danny Gould is the facility's health services administrator.  Mr. Gould is neither a nurse nor a doctor and
therefore is not responsible for medical treatment provided to inmates.

McClellan's claims for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to construe the aforementioned reports as motions for summary judgment.  *Order of February 6, 2012 - Doc. No. 18*; *see also Order of February 23, 2012 - Doc. No. 20*.  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of these motions and the evidentiary materials filed in support thereof, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison [medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motions for summary judgment, McClellan is required to produce "sufficient [favorable] evidence" which

would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of

the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where

pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to

a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279

(11th Cir. 2001) (to establish a genuine dispute of material fact, nonmoving party must produce

evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving

party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant

does not escape the burden of establishing by sufficient evidence a genuine dispute of material

fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.

1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of

elementary principles of production and proof in a civil case. In this case, McClellan fails to

demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment.

*Matsushita*, *supra*.

### III. DISCUSSION

McClellan asserts that during his confinement at Bullock in the latter part of 2011 he

received inadequate medical treatment for an injury to his right shoulder and purported resulting

numbness in his right arm. *Complaint - Doc. No. 1* at 2-3. Specifically, McClellan alleges that

from the time he suffered the injury on October 22, 2011 and for several weeks thereafter while

incarcerated at Bullock the defendants "denied [him] proper medical treatment" for his injured

arm. *Id*. at 3.[3] The defendants adamantly deny they acted with deliberate indifference to

_____

[3]The record establishes that McClellan was transferred from Bullock on the evening of December 5, 2011. Although he referenced actions occurring after his transfer in a response to the defendants' reports, McClellan did not seek to amend the complaint. Consequently, this case is before the court only on those claims raised in the complaint regarding medical treatment provided to McClellan at Bullock as any other claims are not properly before the court.

McClellan's medical needs.  In support of this assertion, the defendants maintain that they provided medical treatment to McClellan in accordance with their professional judgment and also scheduled McClellan an appointment with a free-world neurologist on December 5, 2011, an appointment McClellan concedes he refused to attend.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly

---

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgement stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [applicable procedural rules]. A plaintiff many not amend [his] complaint through argument in a brief opposing summary judgment.").

disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need ...,

Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to

that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser*

*Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009).  When seeking relief based on deliberate

indifference, an inmate is required to establish "an objectively serious need, an objectively

insufficient response to that need, subjective awareness of facts signaling the need and an actual

inference of required action from those facts."  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d

at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to

the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and

disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists and

he must also draw the inference."  *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164,

168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just

knowledge of symptoms, and ignore known risk to serious condition to warrant finding of

deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he

should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir.

1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).  Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

The affidavits filed by the defendants address the claims made by McClellan alleging a lack of adequate medical treatment.  A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with treatment provided to McClellan relative to the instant claim of deliberate indifference.  The medical records indicate that McClellan reported to the health care unit on October 22, 2011 complaining of an injury to his right arm. *Exhibit A to the Special Report of Defendants Hood, Siddiq and Gould (Medical Records of Jeffrey Allen McClellan) - Doc. No. 17-4* at 19.  The attending nurse, K. Norris, examined McClellan and contacted Dr. Siddiq for treatment instructions.  Dr. Siddiq provided voice orders for an x-ray of McClellan's right shoulder and provision of Tylenol for pain, medication McClellan already received via a previous physician's order. *Id*. at 24, 36.  Medical personnel also advised McClellan to "return to [the] infirmary if pain persists[,]" *id*. at 36, and issued him a special needs form for a bottom bunk profile. *Id*. at 19.  Nurse Practitioner Webb avers "that on October 27, 2011, I saw Inmate McClellan as a follow-up to a recent fall on October 22, 2011 ... where he injured his right arm.

10

He presented with full passive range of motion, no edema, no heat, no swelling, and no
discoloration.  I reviewed an x-ray report of his right shoulder [which indicated old surgical
scarring and injuries], ordered an x-ray of his cervical spine and [scheduled McClellan] a follow
up [appointment with Dr. Hood for the next week]." *Exhibit B to the Special Report of
Defendant Webb (Affidavit of Martty Jo Webb) - Doc. No. 16-2* at 1; *see also Exhibit A to the
Special Report of Defendant Webb (Medical Records of Jeffery Allen McClellan) - Doc. No. 16-1*
at 2; *Exhibit A to the Special Report of Defendants Hood, Siddiq and Gould (Medical Records
of Jeffrey Allen McClellan) - Doc. No. 17-4* at 30 (same).  Webb further advises that "[o]ther
than this one visit, I did not assess or treat Inmate McClellan...." *Exhibit B to the Special Report
of Defendant Webb (Affidavit of Martty Jo Webb) - Doc. No. 16-2* at 2; Webb also renewed
McClellan's bottom bunk profile for a thirty-day period of time. *Exhibit A to the Special Report
of Defendants Hood, Siddiq and Gould (Medical Records of Jeffrey Allen McClellan) - Doc. No.
17-4* at 20.  Dr. Hood examined McClellan on November 2, 2011 and addresses McClellan's
allegations, in pertinent part, as follows:

> ... In my role as Associate Regional Medical Director, I am not assigned
> responsibilities for any one single correctional facility.  The overall clinical
> management for each facility is assigned to a physician who holds the position of
> [facility] "medical director."  As the Associate Regional Medical Director, I am
> generally responsible for supervising and providing support to the clinicians
> throughout the correctional facilities in Alabama in which Corizon is currently
> providing medical services....
>
> During November of 2011, Dr. Siddiq scheduled his personal vacation and
> I was asked to see patients at Bullock during his absence, which is not uncommon
> in my role as Associate Medical Director.  While I was on-site at Bullock on
> November 2, 2011, I evaluated Mr. Jeffrey Allen McClellan ("Mr. McClellan").
> At the time of my examination, Mr. McClellan informed me that he had fallen
> from a bunk [the previous week].
>
> I reviewed Mr. McClellan's x-rays [taken immediately] following the fall

which did indicate prior multiple surgeries to his right shoulder as well as a previous amputation of a portion of the distal clavicle (i.e. collar bone). The shoulder x-ray did not reveal any fracture of any type, though it did suggest a possible minor separation of his shoulder which likely resulted from the fall and/or may have preexisted prior to his fall from the upper bunk. X-rays of Mr. McClellan's spine were normal.

Despite complaints from Mr. McClellan related to limited range of motion and loss of function, I noted [upon my November 2, 2011 examination] that Mr. McClellan showed "good range of motion" [of his right shoulder] with some discomfort [and good range of motion in the right elbow and wrist]. I also noted that Mr. McClellan failed to make any "effort to make [his] fists open and close." As indicated through this examination, I confirmed that there was positive blood circulation in Mr. McClellan's hand and palm and that he was not experiencing any type of paralysis [i.e., "hand and palm are ... not flaccid or paralyzed."] In order to determine if any of his symptoms were being exaggerated, I did distract Mr. McClellan at one point and noted that his hand "released," which suggested to me that [the] extent of his *symptoms* were possibly being exaggerated. As indicated in my notes, I also believed that Mr. McClellan was possibly experiencing some type of brachial plexus injury or reflex sympathetic dystrophy. Given Mr. McClellan's history of surgical procedures to his right shoulder, I scheduled an appointment for him with an off-site neurology specialist [after my evaluation] on November 2, 2011. As with most off-site providers, we could not schedule an appointment immediately, but Mr. McClellan did receive an appointment on the first available date of December 5, 2011.... I also provided Mr. McClellan with an order and profile dated November 2, 2011, allowing him to utilize a sling for his right arm.

Following my November 2, 2011, evaluation of Mr. McClellan, I have not seen him again. Moreover, I have not been asked to provide any type of medical treatment of any kind and was not aware of any medical treatment which Mr. McClellan sought or received after November 2, 2011. My only role in Mr. McClellan's treatment involved the November 2, 2011, appointment. I am now aware that Mr. McClellan refused the off-site appointment with the neurology specialist, which he has the right to do....

*Attachment 1 to the Special Report of Defendants Hood, Siddiq and Gould (Affidavit of Dr. Hugh Hood) - Doc. No. 17-1* at 2-4 (internal citations to medical records omitted) (emphasis in original).

In a supplemental affidavit addressing the specifics of his November 2, 2011 examination

of McClellan, Dr. Hood states:

> ... I do not recall whether I ever touched Mr. McClellan, [however] it remains true that I conducted a physical examination on this particular occasion. First, it should be noted that I had the benefit of the x-rays taken following Mr. McClellan's fall at the time of this November 2, 2011, appointment, which necessarily eliminated a number of possible injuries which might have required me to touch Mr. McClellan, manipulate his arm in some manner or have Mr. McClellan remove his shirt. As with most shoulder injuries, one key indicator of injury identified through a physical examination involves a patient demonstrating his or her range of motion, i.e., the ability of the patient to move his or her arm in various directions with or without discomfort. As I indicated in my notes from November 2, 2011, I personally witnessed the range of motion demonstrated by Mr. McClellan on this occasion. These notes also indicate that a member of the medical staff took Mr. McClellan's vital signs at the time of the examination. During the exam, I personally observed Mr. McClellan's overall condition. I personally observed Mr. McClellan following my instructions to make a fist with his hands. I personally viewed his arm and hand and noted the absence of any external signs of trauma or circulatory issues which would have required further investigation. So, with respect to the allegation that I "did not perform an examination of him on November 2, 2011," this statement is false.
>
> At the conclusion of this exam, I explicitly directed Mr. McClellan to attend an appointment with a neurologist related to his complaints [- an appointment which Mr. McClellan subsequently refused to attend].

*Attachment A to the Supplemental Special Report of Defendants Hood, Siddiq and Gould*

*(Supplemental Affidavit of Dr. Hugh Hood) - Doc. No. 21-1* at 3-4 (internal citations to medical

records omitted).

Dr. Siddiq provides the following explanation of the treatment afforded McClellan during

the period of time relevant to the instant complaint.

> Mr. McClellan was evaluated on an emergency basis on October 22, 2011, after he fell from his top bunk. As soon as the medical staff notified me of Mr. McClellan's injury, I ordered the medical staff to take an x-ray of Mr. McClellan's right shoulder and also provide him with Tylenol.... As indicated in the notes from the evaluation on October 22, 2011, Mr. McClellan was given orders to undergo x-rays and provided with Tylenol and instructed to "return to infirmary if pain persists." Despite receiving a prescription for Tylenol in

October of 2011 [for complaints of right shoulder pain], Mr. McClellan routinely failed to appear at pill call to receive this medication.

This was not the first occasion that Mr. McClellan had mentioned shoulder pain.  As early as June 13, 2011, Mr. McClellan had voiced complaints of shoulder pain.  In September of 2011, Mr. McClellan was evaluated for chronic right shoulder pain.

Following his fall from the top bunk [on October 22, 2011], Mr. McClellan received a profile allowing him to use only a bottom bunk.  The Bullock medical staff continued to provide Mr. McClellan with a bottom bunk profile as indicated through the profile[] signed on October 27, 2011, by a member of the medical staff.  Additional x-rays pertaining to Mr. McClellan [and his complaints regarding issues with his right arm and shoulder] were also taken on October 27, 2011.

Because I was traveling outside of the United States on November 2, 2011, Dr. Hood ... saw Mr. McClellan on this date.  Following this appointment, Mr. McClellan was scheduled to see an off-site neurology specialist.  Because a neurology consultation was scheduled for Mr. McClellan on November 2, 2011, a medical "Hold" was assigned to him, which prevented the Department of Corrections from transferring him to another facility pending his off-site neurology consultation.  This medical "Hold" procedure is the standard operating procedure at Bullock.  Between November 4, 2011, and November 27, 2011, Mr. McClellan was housed in the segregation unit at Bullock where he received regular visits from members of the medical staff.

Mr. McClellan submitted a sick call request form on ... November 20, 2011, requesting to see a physician related to his right shoulder and arm.  During the course of sick call on November 22, 2011, Mr. McClellan notified the medical staff that he would not attend ... the off-site appointment scheduled for him with a neurology specialist.  He also demanded that the medical "Hold" be removed so that he could be transferred to another facility.  When I learned of Mr. McClellan's refusal to attend the off-site appointment, Mr. McClellan was summoned to the health care unit for evaluation by me.  This was the first occasion that I saw Mr. McClellan since he fell from the bunk.  Upon examination, I noted that Mr. McClellan had undergone several different surgeries to his right arm which had resulted in the development of scarring.  I also noted that Mr. McClellan demonstrated normal muscle tone and normal function in his arm[], forearm and hand.  We discussed at length Mr. McClellan's refusal to attend the neurology appointment scheduled for him, but I could not convince Mr. McClellan to attend this appointment.  Mr. McClellan repeatedly told me on November 22, 2011, that he did not want anything further done for his shoulder or arm.  Therefore, I changed Mr. McClellan's medical coding and withdrew the medical "Hold" from his medical coding on November 22, 2011, pursuant to his request.

In order to ensure that Mr. McClellan's intentions of November 22, 2011, were clearly documented, we asked Mr. McClellan to sign a medical refusal form. Mr. McClellan signed documentation on November 22, 2011, confirming his refusal to receive any further treatment for his shoulder which included refusals for the following:

    (1) a follow-up with neurologist in two weeks for right arm weakness;

    (2) any test which can be done to find the cause of weakness;

    (3) ... any type of treatment for my arm.

Mr. McClellan's signature is included on this document. I personally witnessed Mr. McClellan sign this document and this document was consistent with statements that Mr. McClellan made to me during the course of the November 22, 2011, appointment.

Mr. McClellan again refused to attend the off-site appointment with the off-site neurologist on December 5, 2011 - the date of the previously scheduled appointment. Mr. McClellan again signed documentation on December 5, 2011, reflecting his refusal to attend an off-site neurological consultation on this date. [McClellan concedes that he refused to see the neurologist on December 5, 2011. *Plaintiff's June 21, 2012 Response - Doc. No. 31* at 1.] I last saw Mr. McClellan on December 5, 2011. As indicated in my notes from this appointment, Mr. McClellan demonstrated flexibility in his fingers as well as good muscle tone in his entire arm upon examination. Consistent with my prior examination of Mr. McClellan, he did not indicate any loss of control of his arm or any evidence of any kind of any clearly defined neurological deficit in his arm.

As I recorded in my notes, Mr. McClellan's symptoms at that time indicated a possible "brachial plexus" injury which involves injury to the strands of nerves that pass from the spine to the right arm through the shoulder joint. A brachial plexus injury usually results from excessive stretching in the shoulder joint which can cause an increase of scar tissue around the brachial plexus which increases pressure upon the nerve strands and therefore causes some type of neurological deficit in the arm. Injury to the brachial plexus is usually confirmed through paralysis, lack of muscle control, loss of feeling or sensation as well as decreased muscle tone in the arm and shoulder. Minor brachial plexus injuries can heal without any treatment of any kind though range of motion exercises are usually the primary treatment. Most brachial plexus injuries can be resolved through range of motion exercises. Mr. McClellan's symptoms were not consistent with any serious brachial plexus injury, but were more indicative of a minor injury that might even resolve itself without any type of physical therapy.

At the time of the December 5, 2011, appointment, I noted that Mr. McClellan's continuing refusal to attend the off-site neurology appointment as well as my unsuccessful efforts to encourage Mr. McClellan to allow the medical staff to schedule another appointment for him. Mr. McClellan simply would not

agree to any further medical treatment of any kind.

Mr. McClellan [was] transferred from Bullock [on December 5, 2011 and arrived at] Ventress Correctional Facility [during the early morning hours] on December 6, 2011.  I have not seen Mr. McClellan since December 5, 2011.

... At all times during his incarceration at Bullock, I listened to Mr. McClellan's complaints, undertook thorough physical examinations of him and provided medication when appropriate to control the symptoms which he communicated to me.  While I was hopeful that Mr. McClellan would agree to attend the [off-site] appointment [with a neurological specialist], it was apparent to me that this appointment was scheduled primarily as a precautionary step given his medical history, not because of any clearly required medical treatment....

*Attachment 3 to the Special Report of Defendants Hood, Siddiq and Gould (Affidavit of Dr. Tahir Siddiq) - Doc. No. 17-3* at 2-6 (internal citations to medical records omitted).  Dr. Siddiq filed an additional affidavit in which he attempted to clarify the circumstances surrounding his December 5, 2011 consultation with McClellan.  Specifically, in addressing the precise location of this examination, Dr. Siddiq states his notes indicate that this appointment with McClellan did not occur in the segregation unit but, rather, he "saw Mr. McClellan in the health care unit at that time."  *Attachment C to the Supplemental Special Report of Defendants Hood, Siddiq and Gould (Supplemental Affidavit of Dr. Tahir Siddiq) - Doc. No. 21-3* at 3.  Dr. Siddiq further avers that the location of the examination "does not change in any way the findings ... made as of that date" nor does it alter the fact that "Mr. McClellan absolutely and expressly refused to attend an off-site neurological consultation on this date."  *Id*. (internal citations to medical records omitted).  Dr. Siddiq also reaffirms that during this examination he "personally saw Mr. McClellan demonstrate flexibility in his fingers ... [and] visually observed ... that Mr. McClellan exhibited good muscle tone in his entire arm....  Mr. McClellan did not indicate any loss of control of his arm or any evidence of any kind of any clearly defined neurological deficit in his arm" all of

which supported the prior "diagnosis of a possible 'brachial plexus' [injury] to his shoulder." *Id*.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the defendants in addressing McClellan's complaints regarding his shoulder injury did not violate his constitutional rights.  The medical care McClellan received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  The allegations presented by McClellan simply fail to establish deliberate indifference by the defendants.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.  In addition, an inmate's allegation that prison physicians did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'... to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that McClellan received medical care for his injury.  It is likewise evident that the defendants rendered treatment to McClellan in accordance with their professional judgment.  Moreover, McClellan has failed to present any evidence which indicates the

17

defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that the medical defendants acted with deliberate indifference to McClellan's medical needs.  Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that **on or before March 4, 2014**, the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking

on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 18th day of February, 2014.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

19